UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

_____

| | |
|---|---|
| LIBERTAS CLASSICAL ASSOCIATION, | Case No. 1:20-CV-997 |
| Plaintiff, | Honorable Paul L. Maloney |
| v. | **DEFENDANT/COUNTER-PLAINTIFF'S REPLY BRIEF** |
| GRETCHEN WHITMER, individually and in her official capacity as Governor of the State of Michigan; DANA NESSEL, individually and in her official capacity as Attorney General of the State of Michigan; ROBERT GORDON, individually and in his official capacity as Director of the Michigan Department of Health and Human Services; and MARCIA MANSARAY, individually and in her official capacity as Deputy Health Administrator of the Ottawa County Department of Health, | |
| Defendants, | |
| and | |
| MARCIA MANSARAY, individually and in her official capacity as Deputy Health Administrator of the Ottawa County Department of Health, | |
| Counter-Plaintiff, | |
| v. | |
| LIBERTAS CLASSICAL ASSOCIATION, | |
| Counter-Defendant. | |

| | |
|---|---|
| Ian A. Northon (P65082) | Douglas W. Van Essen (P33169) |
| Adam J. Baginski (P83891) | Elliot J. Gruszka (P77117) |
| RHOADES MCKEE PC | SILVER & VAN ESSEN, P.C. |
| Attorneys for Plaintiff/Counter-Defendant | Attorneys for Defendant/Counter-Plaintiff |
| 55 Campau Avenue, NW, Suite 300 | Mansaray |
| Grand Rapids, MI 49503 | 300 Ottawa Avenue, NW, Suite 620 |
| (616) 235-3500 | Grand Rapids, MI 49503 |
| ian@rhoadesmckee.com | (616) 988-5600 |
| abaginski@rhoadesmckee.com | dwv@silvervanessen.com |
| | egruszka@silvervanessen.com |

Pursuant to the Court's directive, Defendant Marcia Mansaray, by and through her counsel, Silver & Van Essen, P.C., submits the following statement in response to Libertas' Brief on October 26, 2020.

## RESPONSE TO COURT'S QUESTION

In direct response to the Court's question of whether preliminary injunctive proceedings are necessary in this case, Ms. Mansaray in her official capacity answers:

"While I have filed a motion for preliminary injunction, I am hopeful that the Court's equitable powers will not be necessary after proofs are presented on Wednesday. As of Libertas has adhered to the Third Cease and Desist Order and represents on page 36 of its October 26, 2020 brief that "[u]ntil it is freed from these lawful limitations on its Constitutional rights, Libertas will remain closed…"   I am hopeful that if the Court finds that Libertas' Constitutional rights are not being violated at least on preliminary analysis and that the Orders of Director Gordon as enforced by the Ottawa County Department of Public Health ("OCDPH") are at least facially valid for preliminary analysis, the Court need not issue an injunction. This will enable Libertas and the OCDPH to work on a reopening plan for in-person learning during the pendency of the lawsuit without the necessity of modifying any court order."

## COUNTER-STATEMENT OF FACTS

Ms. Mansaray and Lisa Stefanovsky intend to testify on Wednesday to the following:

1.      All schools in Ottawa County, except for Libertas, are following the mask and gathering limitations and are reporting positive students and teachers as required for contact tracing and quarantining. This includes all other Christian and Catholic schools.

2.      While schools are allowing students who have a medical excuse from a physician to be unmasked, simply allowing parents who don't want their children to wear masks to sign a waiver is **not** a good faith interpretation of Director Gordon's orders and is not one that any other school in Ottawa County, except Libertas, is making.

3.      Masks protect not only the wearer, but also other students, teachers and the broader community from COVID 19 transmission and its deadly consequences.

4.      Libertas' COVID mitigation measures do not comply with Director Gordon's mandates and have not been effective to stop the spread.

5.      Libertas does not have the authority to determine when contact tracing must occur. That is the OCDPH's responsibility.  Based on its official records *and the second grade teacher's own reports to OCDPH*, the onset of her COVID 19 symptoms was clear at least on October 8, 2020, meaning contact tracing and quarantine of her second grade class was and is necessary given the fact that she taught on that date.

6.      Case No. 1's medical records, do not refute the need for contact tracing.  In fact, her doctor certified to OCDPH that COVID symptoms manifested on the 9th, but even the 10th would be sufficient for contact tracing to occur.  The CDC has set a two-day *rule not a 48-hour rule from some indeterminate and indeterminable time on a date*.

7.      OCDPH did not learn of the Second Case until the morning of Tuesday, October 2020, when an anonymous caller identified the name of the second teacher.  Neither the teacher nor Libertas provided that information despite their obligations under the law.

8.      The unsigned letter that is not on Libertas' letterhead that was allegedly sent to parents on Friday, October 16, 2020 is insufficient.  In fact, it indicates that this teacher's

symptoms surfaced on Sunday, October 11, 2020, meaning that his students were exposed on Friday and need to be contact traced and quarantined.

9.      Libertas is required to report these positive tests to OCDPH and did not.

10.     Without reporting, OCDPH is hampered in its ability to ascertain and mitigate COVID outbreaks, such as has occurred at Libertas.

11.     Other positives are likely among parents, teachers, administrative staff and students at Libertas.

12.     Ottawa County has NOT flattened the curve.  It is in an outbreak.  The largest trauma hospital in the area, Spectrum has never had more COVID patients than at present and is near capacity in its ICU.

13.     Even if children could not get the disease but only spread it, masking would be a modest requirement to stop their community spread of the virus to parents and grandparents, many of whom have secondary health conditions that can make Novel COVID 19 infection a death sentence as it has for over 220,000 Americans since March.

14.     However, as the testimony of Ms. Mansaray and Ms. Stefanovsky will demonstrate, COVID 19 also can have dangerous short and long term health effects on children, with growing concerns about long term neurological effects, including impairment of the senses of smell and taste, thyroid problems and auto-immune disease, even if the children's short-term Novel COVID symptoms are mild.

15.     Strict adherence to masking and gathering limitations has been effective in Ottawa County in curbing a recent 900 student outbreak at GVSU.

16.     OCDPH and its Corporation Counsel do not have any animus or bias against Christian education, generally, or Libertas specifically.

**ARGUMENT**

1. **Libertas misunderstands the Michigan Supreme Court's Ruling *in Re Certified Question*.  The reasoning of this Opinion does not support the invalidity of Director Gordon's use of the Public Health Code for pandemic control measures as limited as mask wearing and gathering limitations.**

Contrary to the assertion of Libertas, the Michigan Supreme Court's Ruling on the constitutionality of the EMPGA was neither unanimous nor even necessarily a harsh rebuke of Governor Whitmer's use of the EMPGA in this Novel COVID 19 pandemic.  In truth, it was a finding that the Michigan State Legislature—which was attacking its own work of 75 years later—failed to do its job in prescribing adequate standards in the EMPGA for the Governor to use it in indefinitely shutting down the economy or suspending aspects of laws such as the Open Meetings Act.  As the Supreme Court itself had observed, Director Gordon was not sitting idly on the sidelines well before its decision, he had been issuing public health orders, including masking and gathering orders that often paralleled the Governor:

> "As if to prove this, the Director of the Department of Health and Human Services (DHHS) has issued a series of orders under MCL 333.2253 simply "reinforcing" key executive orders on COVID-19, such as those mandating masks and instituting the Safe Start Program, which itself contains the Governor's overarching regulatory response to COVID-19 (e.g., remote-work requirements, public-accommodation restrictions, and prohibitions on large gatherings).  Emergency Order Under MCL 333.2253 – Regarding Executive Orders 2020-153, 2020-160, and 2020-161, order of the Director of the DHHS entered July 29, 2020 ("reinforcing" EOs 2020-153, 2020-160, and 2020-161)."

Justice Viviano's Concurring Opinion, *In re Certified Question*, Slip Op. p. 40-41.

Simply stated, unlike the hundreds of emergency orders issued by Governor Whitmer under the EMPGA, Director Gordon's orders do NOT broadly shut down any areas of the economy; but merely prescribe reasonable gathering and mask restrictions in order to keep society and the schools functioning without overwhelming the health care system as came close to occurring in April and May.  They are a "how to do it" not "you cannot do it" edict.  As such, Director Gordon's

use of the PHC has none of the scope and duration problems noted by the Supreme Court in *In re: Certified Question,* regarding the Governor's use of the EMPGA.  Indeed, the October 9, 2020 order expires on October 30, 2020, unless—based on a fresh review of the status of Novel COVID 19 cases, an extension is necessary, which given the uptick the State is seeing in cases on October 20, 2020, can be expected.

In *In re Certified Question,* the majority repeatedly denied that it was being radical nor intruding on legitimate pandemic control devices, noting that the threshold for legislative work to pass constitutional standard was the articulation of legitimate standards to the executive branch:

> Rather, we have explained that a statute must at least "contain[] sufficient limits or standards . . . ."  Seaman, 396 Mich at 308 (emphasis added).  And the United States Supreme Court has used similar language as well.  See, e.g., Mistretta, 488 US at 374 ("[W]e harbor no doubt that Congress' delegation of authority to the Sentencing Commission is sufficiently specific and detailed to meet constitutional requirements.") (emphasis added).

Majority Slip Opinion, pp 40-41.

Under the Public Health Code, MCL 333.2253, the legislature has set sufficient limits; namely the prohibition of gatherings "for any purpose" to control a pandemic and "protect public health."  The prohibition may have broad implications and effect on normal societal operation, but the prohibition itself is simple to understand.   Moreover, the conferral is directed towards "gatherings" which in contagions are the usual infectious facilitator and which is certainly the case with COVID 19.  The fact that the legislation also confers authority to the Director to "establish procedures to be followed during the epidemic to insure continuation of essential public health services and enforcement of public health laws" is also not vulnerable to constitutional delegation attack, since "[t]he leaving of details of operation and administration" to the executive "is not an objectionable delegation of legislative power."  People v Babcock, 343 Mich 671, 680; 73 NW2d 521 (1955); see also Argo Oil Corp v Atwood, 274 Mich 47, 52; 264 NW 285 (1935).

5

Libertas places an absurdly rigid interpretation of the delegation of authority to Director Gordon, suggesting that his only option is to ban all gatherings or not.  In truth, the authority to completely ban an activity entirely necessarily implies the positive power to limit the ban if certain steps are taken, such as masks and social distancing, especially if those steps are necessary for the public health "services and laws" to function.  Indeed, the delegation of authority by statute to State Administrative Agency or County also confers "implied powers and duties as are incident and necessary in the performance of their express powers and duties." *Wright v Bartz*, 339 Mich 55, 59-62 NW2d 458 (1954); *Fellows v Michigan Com'n for the Blind*, 305 Mich App 289, 298; 854 NW2d 482 (2014); see also *Coffman v State Bd of Examiners in Optometry*, 331 Mich 582, 589; 50 NW2d 322 (1951); *Ranke v Michigan Corp & Sec Comm*, 317 Mich 304, 308; 26 NW2d 898 (1947); *Herrick Dist Library v Library of Michigan*, 293 Mich App 571, 586; 810 NW2d 110 (2011).

In this instance, Director's specification of conditions on "how to avoid" a gatherings ban is clearly a necessarily implied power, incident to his "express powers and duties."  As the testimony of Ms. Mansaray and Ms. Stefanovsky will establish, the masking and social distancing edicts in the Director's Orders are necessary to avoid outbreaks that even with them are overwhelming OCDPH in performing the above tasks, thus justifying Director Gordon's Orders under MCL 333.2253. As such, the Orders are not an impermissible delegation of legislative authority.

### 2.  Libertas' due process arguments fail

As this Court held on page 11 of its June 19, 2020 Opinion in *League of Independent Fitness v. Whitmer,* Case No. 1:20-cv-458, the substantive due process standard is deferential to enforcement of COVID orders:

Taking this framework and applying it to the case at hand: the Court must uphold Governor Whitmer's orders unless they have "no real or substantial relation" to the public health crisis, or the challenged order is "beyond all question, a plain, palpable invasion of rights secured by the fundamental law.". As evidenced by South Bay, this standard of review is highly deferential to the executive branch. It is not this Court's place to second-guess the executive's pandemic plan, to apply its own policy judgments to that plan, or to use hindsight to craft a "better" plan. Case 1:20-cv-00458-PLM-PJG ECF No. 42 filed 06/19/20 PageID.1116 Page 11 of 17 12 Rather, this Court must uphold the Governor's Executive Orders as long as they are supported by some relation to the public health.

Libertas asserts that this case is exactly like *League of Independent Fitness* urging this Court to Unlike the State in that case, in this instance, the Affidavit of Mansaray establishes that masks matter and the uniform mask and gathering limitations have a relationship in stopping or at least slowing the spread.  Further, where students in particular are not social distancing and masking, the contagion spreads.  Thus, substantive due process violations cannot be established.

As for procedural due process, emergency orders by definition cannot occur by rule making.  The procedural due process test is limited to whether before enforcement, a party has the right to be heard and that is obviously occurring at present in this Court.  See *Board of Regents v. Roth*, 408 U.S. 564, 569–71 (1972).  While the requirements of procedural due process apply only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property, when protected interests are implicated, the right to some kind of prior hearing is paramount. The Court has already noted this Counsel's e-mail conceding that enforcement activities should occur in the same legal proceeding where Plaintiff chooses to litigate its defenses since enforcement and defense arise out of the same nucleus of operative facts form one essential or constitutional case.  28 U.S.C. 1367(a).

   3. **Libertas' 1st Amendment claims are ineffectual.  OCDPH is ONLY trying to compel Libertas to follow the same rules as EVERY other private, parochial and public school—mask up, socially distance, and report positive COVID cases for contact tracing**

Ottawa County officials have learned that there is a COVID outbreak at the school.  On Thursday, October 15, 2020, OCDPH learned that a person was positive and pursuant to its duties, it contacted that person who revealed she was a second-grade teacher at Libertas, named "Ms. Wehrman," (Case No. 1).  She identified the onset of her symptoms as October 6, 2020 and in a phone, conversation said she developed a fever on the evening of Thursday, October 8, 2020, after teaching a full class of second graders, unmasked, earlier in the day.  When Libertas was contacted the next day, it refused to quarantine these students or even give their names or other information so the OCDPH could contact trace.

Accordingly, on Monday, October 19, 2020, a public health order was issued to Libertas directing it to quarantine the second-grade class and provide names for contact tracing.  See Exhibit 4.  Libertas refused to do so.  Things got worse.  On Tuesday, October 20, 2020, OCDPH learned from an anonymous source that a second teacher a Mr. Congrove (Case No. 2) was seriously ill with COVID 19.  OCDPH was able to locate a file from the week before where this person had developed symptoms on the 13th and was tested positive on the 14th and while he would not identify his employer for the nurse on that date, revealed that he had notified his employer.  If the letter Libertas is alleged to have sent to parents on the 16th is true, Case No. 2 became symptomatic on October 11th, presumably making any students he taught on Friday, October 9th exposed to COVID 19 virus shedding under CDC guidelines.

Libertas has failed to report to OCPHD the infections of either Case 1 or Case 2 in violation of R. 325.173(9).[1]  Under R. 325.174(1)(2)(a)-(f), when a communicable disease is present, the

---

[1] R. 325.173(9) provides:
 "A primary or secondary school, child  day  care  center,  or  camp  shall report, within  24  hours  of suspecting,  both  of  the  following  to  the  appropriate local  health  department:   (a) The occurrence  among those  in  attendance  of  any  of  the  serious communicable  diseases   listed  and  maintained  by  the  department as  required  in   MCL  333.5111(1),      except   for    human  immunodeficiency  virus   and   acquired immunodeficiency   syndrome   which   are  governed  by  MCL  333.5131.    (b) The  unusual  occurrence, outbreak, or epidemic of any disease, infection, or condition among those in attendance.'

local public health department (not Libertas) determines what information is necessary and

obligates schools, including Libertas to provide that information:

> "(1) The department or the local health department that has jurisdiction where an individual who has a reported condition resides or where an illness or infection is being or may be spread shall initiate an investigation as necessary.
>
> (2) An investigator who presents official identification of the local health department or the department shall promptly be provided with medical, epidemiologic, and other information pertaining to any of the following:
> > (a) Individuals who have designated conditions or other conditions of public health significance.
> > (b) Individuals, whether ill or well, who are part of a group in which an unusual occurrence, outbreak, or epidemic has occurred.
> > (c) Individuals who are not known to have a designated condition but whose medical or epidemiological information is needed for investigation into the cause of the occurrence of the condition.
> > **(d) Individuals who were potentially exposed to a designated condition.**
> > (e) Individuals who may be a carrier or health threat to others under MCL 333.5201.
> > (f) Any other information that may be relevant to an investigation under this rule."

*Id.* (Emphasis Added).

OCDPH has the right to demand information as early as five days before COVID onset,

not just two days. This discretion is given to it, not to Libertas. Libertas has asserted no religious

interest whatsoever in refusing to cooperate with the reporting requirements of Michigan law.

As for masking and gathering, Libertas' protestations about religious interference are not

supported by any facts. It is nondenominationally Christian. There is nothing in the Bible that

remotely comes close to prohibiting face coverings or gathering restrictions. Nothing in the Bible

prohibits singing with a mask or gathering at socially distant spacing. Libertas' efforts to suggest

that some businesses are allowed to gather up to 500 individuals indoors is a non-sequitur. Libertas

could also gather up to 500 individuals if it met the same space/occupancy limitations that these

businesses face. It is not Ottawa County's problem that Libertas' gymnasium is too small to hold

its student body plus socially distance pursuant to the gathering limitations, any more than a fire marshal's occupancy limitations may restrict the ability of all parents to attend a basketball game in its gymnasium.

Even if Libertas amends its pleadings to allege some religious tenet that is factually, materially compromised by adhering to mask wearing, gathering restrictions, reporting of positive COVID infections among staff and students, or cooperating with contact tracing, it's First Amendment claim is going to fail, because the Defendants have a compelling public interest in these restrictions or enforcing these duties.

When presented with a request for an injunction against COVID 19 prohibitions against in-church, in person religious worship services in the State of California, the United States Supreme Court supported the restriction as having a compelling governmental interest:

> Although California's guidelines place restrictions on places of worship, those restrictions appear consistent with the Free Exercise Clause of the First Amendment. Similar or more severe restrictions apply to comparable secular gatherings, including lectures, concerts, movie showings, spectator sports, and theatrical performances, where large groups of people gather in close proximity for extended periods of time. And the Order exempts or treats more leniently only dissimilar activities, such as operating grocery stores, banks, and laundromats, in which people neither congregate in large groups nor remain in close proximity for extended periods.

*S Bay United Pentecostal Church v Newsom*, 140 S Ct 1613 (2020).

Even in the recent 6th Circuit Cases striking down a complete ban on religious worship, the Court noted that it was only doing so because the state was allowing other gatherings:

> Keep in mind that the Church and its congregants just want to be treated equally. ***They don't seek to insulate themselves from the Commonwealth's general public health guidelines***. They simply wish to incorporate them into their worship services. ***They are willing to practice social distancing. They are willing to follow any hygiene requirements. They do not ask to share a chalice.*** The Governor has offered no good reason for refusing to trust the congregants who promise to use care in worship in just the same way it trusts accountants, lawyers, and laundromat workers to do the same.

*Roberts v. Neace*, 958 F.3d 409, 414 (6th Cir. 2020) (Emphasis Added).

Here, unlike the congregations in *Roberts,* Libertas is:

- "[asking]to insulate themselves from the [State's] general public health guidelines";

- "[un]willing to practice social distancing";

- "[un]willing to follow hygiene requirements".

- Asking the State and County to trust them in ways that they do not trust accountants, lawyers, laundromat workers.

In short, Libertas demands special treatment, different from the way other Catholic, Protestant and public schools are being treated without objection.

This Court undoubtedly knows the importance of the sharing of "wine" within the sacrament that is the essential activity and purpose of the Catholic mass; yet, it was very clear that the 6th Circuit would have found that requiring Catholics to suspend the "sharing of the chalice" and requiring the distribution of the wine [like most Protestants do through individual glasses] to be a reasonable restriction to require of Catholicism during this very pandemic.

Simply stated, this Court after hearing the testimony on Wednesday, will conclude that mask and gathering restrictions carry a compelling governmental interest that more than justifies any minor intrusion on Libertas' First Amendment rights, in articulated as they are.

**4. Libertas misinterprets Director Gordon's orders when it argues that its classes and chapel are religious worship in a place of worship.**

Libertas raises the interpretive issue that Director Gordon's October 9th Order does not apply to it based on Paragraph 10, "Implementation" which in subparagraph (d) states:

"Neither a place of religious worship nor its owner is subject to penalty under this order for allowing religious worship at such place.  No individual is subject to penalty under this order for engaging in religious worship at a place of religious worship."

First, Libertas is wrong when it calls this subparagraph a "carve out."  The Order clearly applies to all gatherings even those that are religious in a place of worship.  The Order merely limits the applicability of certain remedies, such as any that involve a penalty, in those situations. There is no prohibition against declaratory relief or, frankly, injunctive relief pertaining to a church and its religious services.  A church or other religious organization is simply not subject to "penalty," meaning fines or costs.  Even if all enforcement relief were prohibited, which it isn't, the edict would still have the weight of voluntary compliance (which is all most people and organizations need) as the law of the land, or carry with it the potential impact of a "negligence per se" finding in a civil case against the organization, if because of noncompliance, a third party became ill.

Second, Libertas has not pled that its building is a "place of worship" for good reason; it is a school.  Obviously, people can pray or worship anywhere and at any time.  Prayer is common in all parochial schools and can even occur under some conditions in public schools. by students voluntarily.  The fact that it begins its school day with chapel or each class with prayer does not make Libertas a "place of worship" as that term is used above.

Finally, even if chapel or prayer were excluded from the masking requirements of the Orders, class is certainly not, nor is Libertas exempt from the reporting provisions of R. 325.173(9) or R. 325.174(1)(2)(a)-(f), which do not contain this language.

## 5. The Public Health Orders are presumed to be valid and enforceable.

Successfully challenging state statutes and regulations and orders issued under state statute is, of course, a difficult task.  Once promulgated or issued, such statutes, rules and orders have the

force of law and carry the presumption of validity. Cf. *United States v. Mersky*, 361 U.S. 431, 437-38, 80 S.Ct. 459, 4 L.Ed.2d 423 (1960). Much deference is due the agencies charged with the administration of the Act. *Lewis v. Martin*, 397 U.S. 552, 90 S.Ct. 1282, 25 L.Ed.2d 561 (1970).

Given the fact that Libertas is experiencing a COVID outbreak, Ms. Mansaray in her official capacity has a substantial likelihood of prevailing that the Director's Orders under the Public Health Code and OCDPH cease and desist orders are enforceable and that irreparable harm to everyone, including Libertas' staff and students will occur unless there is compliance herewith. Finally, there is no doubt that the public interest supports curtailing this pandemic in any reasonable way possible.  As this Court has already found In *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*: "When state actors are faced with 'great dangers' like a pandemic, they may use their police power with great latitude to protect the health and safety of the general public." ___ F. Supp. 3d ___, No. 1:20-CV-458, 2020 WL 3421229, at *4 (W.D. Mich. June 19, 2020) (citing *Jacobson*, 197 U.S. at 29).

## CONCLUSION

No one who has paid even a modicum of attention to the recent Rose Garden Super-spreader virus fiasco can deny that the failure to wear masks can have serious consequences for the spread of this disease as victim after victim sheepishly admits to a mistake in not wearing a mask at the event—former New Jersey Governor Chris Christie who spent a week in ICU being the latest.  Thus, with young lives, avoiding the contagion is important and masking and social distancing are the best short-term stratagem for disease avoidance.

The truth is that the benefits of living in a civilized society require adherence numerous rules and regulations that limit freedom in all kinds of areas such as hooking up to public water, honoring traffic lights, adhering to building codes or occupancy restrictions or fire safety.

Following the edicts of the Public Health Code, its promulgated rules and orders authorized thereunder during a pandemic is simply one of the sacrifices we all share by being in this contagion together.

Ms. Mansaray prays that this Court will deny Libertas' motion for preliminary injunction, declare that Director Gordon's and OCDPH's orders are presumptively valid and enforceable and trust that Libertas will comply.   If not, the Court should stand by to enjoin Libertas' violation if it resumes.

SILVER & VAN ESSEN, P.C.
Attorneys for Defendant/Counter-Plaintiff
Mansaray


Date: October 26, 2020                    By: _____
                                               Douglas W. Van Essen (P33169)
                                               Elliot J. Gruszka (P77117)

                                          BUSINESS ADDRESS AND TELEPHONE:
                                               300 Ottawa Avenue, NW, Suite 620
                                               Grand Rapids, MI 49503
                                               (616) 988-5600
                                               dwv@silvervanessen.com
                                               egruszka@silvervanessen.com