UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN

LIBERTAS CLASSICAL ASSOCIATION,

              Plaintiff/Counter-Defendant,    No. 1:20-cv-00997

v                                   HONORABLE PAUL L. MALONEY

GRETCHEN WHITMER, individually and   MAG. JUDGE PHILLIP J. GREEN
in her official capacity as Governor of the
State of Michigan, DANA NESSEL,
individually and in her official capacity as
Attorney General of the State of Michigan,
ROBERT GORDON, individually and in        **BRIEF IN SUPPORT OF**
his official capacity as Director of the      **DEFENDANTS GOVERNOR**
Michigan Department of Health and       **GRETCHEN WHITMER,**
Human Services, and MARCIA     **DIRECTOR ROBERT GORDON,**
MANSARAY, individually and in her     **AND ATTORNEY GENERAL**
official capacity as Deputy Health        **DANA NESSEL'S**
Administrator of the Ottawa County    **JOINT MOTION TO DISMISS**
Department of Health,             **PLAINTIFF'S COMPLAINT**
                                 **UNDER FEDERAL RULES OF**
               Defendants,       **CIVIL PROCEDURE 12(b)(1), (6)**

and

MARCIA MANSARAY, individually and
in her official capacity as Deputy
Administrator of the Ottawa County
Department of Health,

              Defendant/Counter-Plaintiff.

Ian Alexander Northon (P65082)     Daniel J. Ping (P81482)
Adam J. Baginski (P83891)         John G. Fedynsky (P65232)
Rhoades McKee, P.C.              Assistant Attorneys General
Attorneys for Plaintiff/Counter-Defendant   Attorneys for Defendants Gretchen
Libertas Classical Association       Whitmer and Robert Gordon
300 Riverfront Plaza Bldg.           P.O. Box 30736
55 Campau Ave., NW, Ste. 300      Lansing, MI 48909
Grand Rapids, MI  49503-2642     (517) 335-7632
(616) 233-5125                 PingD@michigan.gov

inorthon@rhoadesmckee.com                    FedynskyJ@michigan.gov
abaginski@rhoadesmckee.com

Ann M. Sherman (P67762)                       Douglas W. Van Essen (P33169)
Deputy Solicitor General                      Elliot J. Gruszka (P77117)
Rebecca A. Berels (P81977)                    Silver & Van Essen, P.C.
Assistant Attorney General                    Attorney for Defendant/Counter-
Attorneys for Defendant Dana Nessel           Plaintiff Marcia Mansaray
P.O. Box 30212, Lansing, MI 48909             300 Ottawa Ave., NW, Ste. 620
(517) 335-7628                                Grand Rapids, MI 49503
ShermanA@michigan.gov                         (616) 988-5600
BerelsR1@michigan.gov                         dwv@silvervanessen.com
                                              egruszka@solvervanessen.com

---

**BRIEF IN SUPPORT OF DEFENDANTS GOVERNOR GRETCHEN
WHITMER, DIRECTOR ROBERT GORDON, AND ATTORNEY GENERAL
DANA NESSEL'S JOINT MOTION TO DISMISS PLAINTIFF'S COMPLAINT
UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) & (6)**

Daniel J. Ping (P81482)
John G. Fedynsky (P65232)
Assistant Attorneys General
Michigan Dep't of Attorney General
Attorney for Defendants Governor
Whitmer and MDHHS Director Gordon
P.O. Box 30736, Lansing, MI 48909
(517) 335–7632
pingd@michigan.gov
fedynskyj@michigan.gov


Ann M. Sherman (P67762)
Deputy Solicitor General
Rebecca A. Berels (P81977)
Assistant Attorney General
Michigan Dep't of Attorney General
P.O. Box 30212, Lansing, MI 48909
(517) 335-7628
ShermanA@michigan.gov
BerelsR1@michigan.gov

# TABLE OF CONTENTS

Page

Index of Authorities ..................................................................................... v

Concise Statement of Issues Presented ..................................................... xi

Introduction ................................................................................................. 1

Statement of Facts ...................................................................................... 4

    A.    The nature of the COVID-19 pandemic ..................................... 4

    B.    The State of Michigan's response to the COVID-19 pandemic. .......... 10

    C.    Ottawa County's Department of Public Health closes Plaintiff's in-person schooling operations, citing multiple violations of the order. .................................................................................. 12

Argument ................................................................................................... 15

I.    Governor Whitmer, Director Gordon, and Attorney General Nessel are entitled to Eleventh Amendment immunity regarding Plaintiff's state-law claims. ................................................................................ 15

II.    This Court should abstain from deciding any of Plaintiff's claims. ............... 17

    A.    *Pullman* abstention ............................................................... 17

    B.    *Thibodaux abstention* ............................................................ 20

III.    If this Court declines to abstain from exercising jurisdiction over Plaintiff's federal claims against the State Defendants, it should dismiss them on their merits under Rule 12(b)(6) ............................. 22

    A.    Plaintiff's federal constitutional claims cannot survive *Jacobson*. ...... 23

    B.    Even absent *Jacobson*, Plaintiff's federal constitutional claims fail as a matter of law ........................................................... 27

        1.    Plaintiff's Count III (religious freedom) is meritless. ............... 27

        2.    Plaintiff's Count I (freedom to associate) is meritless. ............. 32

        3.    Plaintiff's Count II (right to parent) is meritless. ..................... 34

        4.    Plaintiff's Count V (procedural due process) is meritless. ......... 35

Conclusion and Relief Requested .................................................................... 40

# INDEX OF AUTHORITIES

<u>Page</u>

## Cases

*Armengau v. Cline,*
  7 Fed. Appx. 336 (6th Cir. 2001)............................................................. 4

*Armour v. City of Indianapolis,*
  566 U.S. 673 (2012) ........................................................................ 24, 25

*Armstrong v. Manzo,*
  380 U.S. 545 (1965) ............................................................................. 35

*Ashcroft v. Iqbal,*
  556 U.S. 662 (2009) ............................................................................. 22

*Bowen v. Roy,*
   476 U.S. 693 (1986) ............................................................................ 29

*Boy Scouts of Am. v. Dale,*
  530 U.S. 640 (2000) ............................................................................. 33

*Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy,*
  367 U.S. 886 (1961) ............................................................................. 36

*cf. Rock v. Carney,*
  185 N.W. 798 (Mich. 1921)................................................................... 4

*CH Royal Oak, LLC v. Whitmer,*
  No. 1:20-cv-570, 2020 WL 4033315, at *6 (W.D. Mich. July 16, 2020) ................. 25

*Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the
  Law v. Martinez,*
  561 U.S. 661 (2010) ........................................................................ 28, 33

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,*
  508 U.S. 520 (1993) ............................................................................. 28

*City of Dallas v. Stanglin,*
  490 U.S. 19 (1989) ............................................................................... 33

*City of Houston, Tex. v. Hill,*
  482 U.S. 451 (1987) ............................................................................. 18

*Colorado River Water Conservation Dist. v. United States,*
  424 U.S. 800 (1976) ........................................................................... 20, 21

*Edelman v. Jordan,*
  415 U.S. 651 (1974) ................................................................................. 16

*Elim Romanian Pentecostal Church v. Pritzker,*
  962 F.3d 341 (7th Cir. June 16, 2020) .................................................... 26

*Emp't Div., Dep't of Human Resources of Oregon v. Smith,*
  494 U.S. 872 (1990) ................................................................................. 29

*Ernst v. Rising,*
  427 F.3d 351 (6th Cir. 2005) ............................................................. 15, 16

*Ex Parte Young,*
  209 U.S. 123 (1908) ................................................................................. 16

*Fleming v. U.S. Dep't of Agric.,*
  713 F.2d 179 (6th Cir. 1983) ............................................................. 35, 37

*Freeman v. Michigan Dep't of State,*
  808 F.2d 1174 (6th Cir. 1987) ................................................................. 16

*Garcia v. Fed. Nat. Mortg. Ass'n,*
  782 F.3d 736 (6th Cir. 2015) ................................................................... 35

*Geller v. de Blasio,*
  No. 20-CV-3566 (DLC), 2020 WL 2520711, at *3 (S.D.N.Y. May 18, 2020) ......... 24

*Harman v. Forssenius,*
  380 U.S. 528 (1965) ................................................................................. 18

*Harris v. City of Akron,*
  20 F.3d 1396 (6th Cir. 1994) ................................................................... 36

*Harrison v. NAACP,*
  360 U.S. 167 (1959) ........................................................................... 18, 19

*Hartley Co. v. JF Acquisition, LLC,*
  No. 15-cv-94, 2017 WL 1628529, at *4–5 (S.D. Ohio May 1, 2017)................ 17

*Hartman v. Acton,*
  No. 2:20-CV-1952, 2020 WL 1932896, *7-9 (S.D. Ohio Apr. 21, 2020) ................. 36

*In re Abbott,*
  954 F.3d 772 (5th Cir. 2020) ................................................................... 24

*In re Certified Questions,*
___ N.W.2d ___, 2020 WL 5877599 (Mich. Oct. 2, 2020) ...................................... 19

*Jacobson v. Commonwealth of Massachusetts,*
197 U.S. 11 (1905) ................................................................... 23, 24, 25, 26

*LaChance v. Erickson,*
522 U.S. 262 (1998) ............................................................................ 35

*Ladd v. Marchbanks,*
971 F.3d 574, (6th Cir. 2020) ................................................................. 16

*Lake Carriers' Ass'n v. MacMullan,*
406 U.S. 498 (1972) ........................................................................... 19

*League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer,*
814 F. App'x 125 (6th Cir. 2020) .............................................................. 23

*Louisiana Power & Light Co. v. City of Thibodaux,*
360 U.S. 25 (1959) .......................................................................... 20, 21

*Maryville Baptist Church, Inc. v. Beshear,*
957 F.3d 610 (6th Cir. 2020) .................................................................. 27

*Mathews v. Eldridge,*
424 U.S. 319 (1976) ..................................................................... 35, 37, 38

*McGhee v. City of Flagstaff,*
No. CV-20-08081-PCT-GMS, 2020 WL 2309881, at *2 (D. Ariz. May 8, 2020) ....... 4

*McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery,*
226 F.3d 429 (6th Cir. 2000) .................................................................. 16

*Mine Safety Appliances Co. v. Forrestal,*
326 U.S. 371 (1945) ........................................................................... 17

*Minnesota v. United States,*
305 U.S. 382 (1939) ........................................................................... 17

*Mithrandir v. Brown,*
37 F.3d 1499 (6th Cir. 1994) .................................................................. 36

*Moore v. City of E. Cleveland,*
431 U.S. 494 (1977) ........................................................................ 34, 35

*Neinast v. Bd. of Trustees of Columbus Metro. Library,*
346 F.3d 585 (6th Cir. 2003) .................................................................. 36

*New Doe Child #1 v. Congress of the United States,*
891 F.3d 578 (6th Cir. 2018) ................................................................ 30

*North American Cold Storage Co. v. Chicago,*
211 U.S. 306 (1908) ............................................................................ 39

*Pennhurst State Sch. & Hosp. v. Halderman,*
465 U.S. 89 (1984) ........................................................................ 15, 16

*Prater v. City of Burnside, Kentucky,*
289 F.3d 417 (6th Cir. 2002) ............................................................... 29

*Railroad Commission of Texas v. Pullman Co.,*
312 U.S. 496 (1941) ................................................................ 17, 18, 19

*Republic of Philippines v. Pimentel,*
553 U.S. 851 (2008) ........................................................................... 17

*Roberts v. Neace,*
958 F.3d 409 (6th Cir. 2020) ............................................................... 27

*Roberts v. United States Jaycees,*
468 U.S. 609 (1984) ................................................................ 32, 33, 34

*Robinson v. Murphy,*
No. CV 20-5420, 2020 WL 5884801 (D.N.J. Oct. 2, 2020) ..................... 26

*Russell v. Lundergan-Grimes,*
784 1037 (6th Cir. 2015) ..................................................................... 16

*S. Bay United Pentecostal Church v. Newsom,*
140 S. Ct. 1613 (2020) .......................................................... 23, 24, 31

*Schulkers v. Kammer,*
955 F.3d 520 (6th Cir. 2020) ............................................................... 34

*Semlow Peak Performance Chiropractic v. Whitmer,*
No. 20-206-MZ (Mich. Ct. Claims) ...................................................... 19

*Shoemaker v. City of Howell,*
795 F.3d 553 (6th Cir. 2015) ............................................................... 38

*Sickles v. Campbell Cty.,*
501 F.3d 726 (6th Cir. 2007) ............................................................... 38

*Song v. City of Elyria,*
985 F.2d 840 (6th Cir. 1993) ................................................................. 4

*Stand Up for California! v. U.S. Dep't of the Interior*,
  204 F. Supp. 3d 212 (D.D.C. 2016) ...................................................... 17

*Torres v. Precision Industries, Inc.*,
  938 F.3d 752 (6th Cir. 2019) ................................................................ 20

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,
  137 S. Ct. 2012 (2017) .......................................................................... 29

*Troxel v. Granville*,
  530 U.S. 57 (2000) ................................................................................ 35

*United Pet Supply, Inc. v. City of Chattanooga, Tenn.*,
  768 F.3d 464 (6th Cir. 2014) ...................................................... 36, 38, 39

*Zinermon v. Burch*,
  494 U.S. 113 (1990) .............................................................................. 36

## Statutes

Mich. Comp. Laws § 333.1101 ...................................................................... 10

Mich. Comp. Laws § 333.2253 ...................................................................... 11

## Other Authorities

American Lung Association, American College of Chest Physicians, American
  Lung Association, American Thoracic Society and COPD Foundation
  Statement on Importance of Patients with Chronic Lung Disease Wearing
  Facial Coverings.................................................................................... 8

CDC, *CDC calls on Americans to wear masks to prevent COVID-19 spread* .............. 7

CDC, Considerations for Wearing Masks.................................................... 7

CDC, *Deciding to Go Out*.............................................................................. 6

CDC, *Evidence Supporting Transmission of Severe acute Respiratory
  Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic*........................ 5

CDC, *Guidance for K-12 School Administrators on the Use of Masks in Schools*....... 9

CDC, *Help Stop the Spread of COVID-19 in Children*.............................................. 10

CDC, *Long-Term Effects of COVID-19*........................................................ 10

CDC, *Social Distancing, Quarantine, and Isolation* ...................................... 5

Hiroshi Nishiura, et al., *Closed environments facilitate secondary transmission of coronavirus disease 2019* ........................................................... 6

Hua Qian, et al., *Indoor transmission of SARS-CoV-2* ................................... 6

Journal of the American Medical Association, *Universal Masking to Prevent SARS-CoV-2 Transmission—The Time Is Now* ........................................ 7

Mingming Liang, et al., *Efficacy of face mask in preventing respiratory virus transmission: A systematic review and meta-analysis*, 36 Travel Medicine and Infectious Disease 10175 (May 28, 2020) ........................................... 9

New York Times, *Flattening the Coronavirus Curve* (March 27, 2020), .................... 6

Sarah Rahal, *Michigan shatters weekly COVID-19 case record for 5th week in a row*, Detroit News, Nov. 14, 2020, ................................................... 2, 6

Steffen Eikenberry, et al., *To mask or not to mask: Modeling the potential for face mask use by the general public to curtail the COVID-19 pandemic*, 5 INFECT DIS MODEL 293 (Apr. 21, 2020) ............................................. 9

Trisha Greenhalgh, et al., *Face masks for the public during the covid-19 crisis*, BMJ 369 (Apr. 9, 2020) ...................................................... 9

Wall Street Journal, *Face Masks Really Do Matter. The Scientific Evidence Is Growing* ............................................................................. 8

World Health Organization, *Modes of transmission of virus causing COVID-19* (March 29, 2020), ............................................................... 5

**Rules**

Fed. R. Civ. P. 12(b)(1) ................................................................. 16

Fed. R. Civ. P. 12(b)(6) ................................................................. 22

**CONCISE STATEMENT OF ISSUES PRESENTED**

1. Are the State Defendants entitled to Eleventh Amendment immunity from Plaintiff's state-law claims?

2. Should this Court abstain from proceeding on Plaintiff's claims?

3. If this Court reaches the merits of Plaintiff's claims, should it dismiss them under Rule 12(b)(6) for failing to state a claim?

## INTRODUCTION

This Court has stated that the coronavirus pandemic "needs no introduction." Indeed, in the eight months the virus has been menacing our state, the severe harms it can cause to our health and society, and the measures we must take to avert those harms, have only become clearer.  Nonetheless, as this and other cases illustrate, a small number of Michigan citizens and businesses remain committed to eschewing the best practices that Michigan's Department of Health and Human Services (DHHS) has developed and implemented in its effort to control the pandemic.  DHHS's authority in this sphere is well established and deeply rooted as a matter of state law in Michigan's Public Health Code.

To Plaintiff, and others like it, dealing with COVID-19 is a matter of individual choice and individual consequences.  Such a worldview—thoroughly rebutted by scientific study—turns a blind eye to the immeasurable suffering imposed on all of our friends, family, and neighbors, particularly the elderly and the vulnerable, when individuals carry and spread this highly contagious pathogen throughout the community at large.  In other words, we are all, in actions and consequences in this pandemic, inescapably connected to one another. Consequently, public health measures must apply generally to everyone.  Desired carveouts cloaked in unfounded constitutional claims undercut the very social compact and aspirational "more perfect union" that is the foundation of our constitutional order.

Despite positive progress attributable to measures such as DHHS's orders, the virus remains prevalent.  In fact, it is resurging; the State of Michigan is in the throes of a second wave.[1]  A critical tool in stopping the spread of COVID-19 is the use of face coverings.  Indeed, CDC Director Robert Redfield has stated that "[c]loth face coverings are one of the most powerful weapons we have to slow and stop the spread of the virus – particularly when used universally within a community setting.  All Americans have a responsibility to protect themselves, their families, and their communities."[2]  With this in mind, in an emergency order dated October 9, 2020, DHHS Director Robert Gordon has required that face coverings be worn by all individuals over the ages of two in a variety of public settings, including schools, and that individuals observe distancing guidelines.[3]

Plaintiff invokes an assortment of constitutional and other legal theories to challenge these restrictions, but they all boil down to the same request:  Plaintiff asks this Court to override the judgment of the State's public health experts and act in a manner contrary to what these experts determined is necessary to protect this State and its residents.  Its request disregards the deference owed to the executive

---

[1] Sarah Rahal, *Michigan shatters weekly COVID-19 case record for 5th week in a row*, DETROIT NEWS, Nov. 14, 2020, https://www.detroitnews.com/story/news/local/michigan/2020/11/14/michigan-shatters-weekly-covid-19-case-record-5th-week-row/6295581002/.

[2] Centers for Disease Control, *CDC calls on Americans to wear masks to prevent COVID-19 spread*, https://www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html.  (Ex. 1.)

[3] As discussed below, this order is no longer in effect, but it remains a basis for Plaintiff's governing complaint.

branch's management of this public health crisis and threatens the progress made in combating the spread of this deadly virus.  Regardless of how Plaintiff styles its request, it is not entitled to the relief it seeks.

But this Court does not need to wade into the merits of Plaintiff's claims—one of which presents complicated state-law questions regarding the interplay between Michigan's statutes and its constitution.  This Court should recognize that Governor Whitmer, Director Gordon, and Attorney General Nessel are immune from Plaintiff's state-law claims under the Eleventh Amendment.  This Court should extend its extant "order of abstention" to the State Defendants pursuant to either one of two available abstention doctrines and decline to reach any of Plaintiff's claims.  In any event, should this Court reach them, Plaintiff's federal constitutional claims are subject to dismissal on their merits.

## STATEMENT OF FACTS

### A.     The nature of the COVID-19 pandemic[4]

The facts surrounding the COVID-19 pandemic are well-established.  SARS-CoV-2 is similar to other coronaviruses (a large family of viruses that cause respiratory illnesses), but the strain is novel.  There is no general or natural immunity built up in the population (meaning everyone is susceptible), no vaccine, and no known treatment to combat the virus itself (as opposed to treatment to mitigate its symptoms).

It is widely known and accepted that COVID-19, the disease that results from the virus, is highly contagious, spreading easily from person to person via

---

[4] The public materials cited herein should not convert this motion to one for summary judgment, because they are not inconsistent with Plaintiff's factual allegations.  Courts evaluating motions to dismiss under Rule 12 may consider items that do "not rebut, challenge, or contradict anything in the plaintiffs' complaint."  *Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993); *see also Armengau v. Cline*, 7 Fed. Appx. 336, 343–44 (6th Cir. 2001) ("[E]xtrinsic materials [that] merely 'fill in the contours and details' of a complaint . . . add nothing new and may be considered without converting the motion to one for summary judgment.").  Furthermore, this Court may consider public records and matters of which it could take judicial notice.  *Armengau*, 7 Fed. App'x at 344; *Allen v. Whitmer*, Case No. 2:20-cv-11020, Order Denying Plaintiffs' Motion to Exclude Exhibits (E.D. Mich. July 10, 2020) (Ex. 2) (concluding materials of the sort offered here could be properly considered under Rule 12); *McGhee v. City of Flagstaff*, No. CV-20-08081-PCT-GMS, 2020 WL 2309881, at *2 (D. Ariz. May 8, 2020) (taking judicial notice of CDC guidance "[b]ecause government publications are matters of public record and can be easily verified."); *cf. Rock v. Carney*, 185 N.W. 798, 802 (Mich. 1921) ("[A] court may be justified in taking judicial notice that the disease is within the statute . . . .  Within reasonable bounds, at least, the health officer's conclusion that a disease is communicable, and is a menace to public health, must be conclusive . . . .").

"respiratory droplets."[5]  Experts agree that being anywhere within six feet of an

infected person puts an individual at a high risk of contracting the disease.[6]

Moreover, because many of those infected experience only mild symptoms, a person

could spread the disease before he even realizes he is sick.[7]  Most alarmingly, a

person with COVID-19 might not yet be symptomatic, but still spread the disease.[8]

Because there is no way to immunize or treat for COVID-19, the Centers for

Disease Control and Prevention (CDC) have indicated that the best way to prevent

illness is to "avoid being exposed."[9]  Pursuant to this advice, governmental entities

have stressed the critical import of "social distancing," i.e., the practice of avoiding

public spaces and limiting movement.[10]  The objective of social distancing has been

---

[5] World Health Organization, *Modes of transmission of virus causing COVID-19* (March 29, 2020), https://www.who.int/news-room/commentaries/detail/modes-of-transmission-of-virus-causing-covid-19-implications-for-ipc-precaution-recommendations  (Ex. 3.)

[6] CDC, *Social Distancing, Quarantine, and Isolation* (June 12, 2020), https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/social-distancing.html  (Ex. 4.)

[7] CDC, *Evidence Supporting Transmission of Severe acute Respiratory Syndrome Coronavirus 2 While Presymptomatic or Asymptomatic* (May 4, 2020), https://wwwnc.cdc.gov/eid/article/26/7/20-1595_article  (explaining that "[o]ne report suggested that up to 13% of infections may be transmitted during the presymptomatic period of illness") (Ex. 5.)

[8] *Id.* (noting that "an increasing number of reports have indicated that some infected persons may not exhibit signs or symptoms of illness, including persons who are presymptomatic (SARS-CoV-2 RNA is detectable before symptom onset) or asymptomatic (SARS-CoV-2 RNA is detectable but symptoms never develop)").

[9] (Ex. 4.)

[10] (*Id.*)

5

termed "flattening the curve," that is, reducing the speed at which COVID-19

spreads.  If the disease spreads too quickly, the limited resources of our healthcare

system easily could become overwhelmed.[11]  This is already taking place in

Michigan.[12]

    With this in mind, the CDC has explained that "[i]ndoor spaces are more

risky than outdoor spaces where it might be harder to keep people apart and there's

less ventilation."[13]  Indeed, studies show that "sharing indoor space is a major

SARS-CoV-2 infection risk."[14]  For example, one preliminary study showed that

"[t]he odds that a primary case transmitted COVID-19 in a closed environment was

18.7 times greater compared to an open air environment."[15]  Additionally, the *time*

in which a person spends in one place seemingly affects the rate of transmission—

the CDC noted that "spending *more time* with people who may be infected increases

---

[11] *Flattening the Coronavirus Curve*, NEW YORK TIMES (March 27, 2020), available at https://www.nytimes.com/article/flatten-curve-coronavirus.html  (Ex. 6.)

[12] Sarah Rahal, *Michigan shatters weekly COVID-19 case record for 5th week in a row*, DETROIT NEWS, Nov. 14, 2020 ("Hospitalizations of virus patients in Michigan are up more than five-fold over six weeks, officials say. Health care leaders are projecting that the state will exceed the spring hospitalization peak late this month.").

[13] CDC, *Deciding to Go Out* (June 15, 2020), available at https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/deciding-to-go-out.html (Ex. 7.)

[14] Hua Qian, et al., *Indoor transmission of SARS-CoV-2* (April 7, 2020), available at https://www.medrxiv.org/content/10.1101/2020.04.04.20053058v1.full.pdf  (Ex. 8.)

[15] Hiroshi Nishiura, et al., *Closed environments facilitate secondary transmission of coronavirus disease 2019* (April 16, 2020), available at https://www.medrxiv.org/content/10.1101/2020.02.28.20029272v2  (Ex. 9.)

your risk of becoming infected" and infecting others.[16]  In short, the longer an

individual spends in an indoor space with others, the higher the risk of infection

becomes for that individual.

In an editorial published in the Journal of the American Medical Association,

the CDC reviewed the latest science and affirmed that cloth face coverings are also

a critical tool in the fight against COVID-19 that could reduce the spread of the

disease, particularly when used universally within communities.[17]  Relying on case

studies, the CDC confirmed that the more individuals wear cloth face coverings in

public places where they may be close together, the more the entire community is

protected.  "Community-level protection afforded by use of cloth face coverings can

reduce the number of new infections and facilitate cautious easing of more societally

disruptive community interventions such as stay-at-home orders and business

closings."[18]  Accordingly, CDC guidelines make clear that everyone should wear a

mask in public while keeping at least six feet away from others in order to curb the

spread of COVID-19.[19]

---

[16] (Ex. 7.)

[17] *Universal Masking to Prevent SARS-CoV-2 Transmission—The Time Is Now*,
Journal of the American Medical Association,
https://jamanetwork.com/journals/jama/fullarticle/2768532.

[18] *Id.*

[19] CDC, *CDC calls on Americans to wear masks to prevent COVID-19 spread*,
https://www.cdc.gov/media/releases/2020/p0714-americans-to-wear-masks.html
(Ex. 10.); CDC, *Considerations for Wearing Masks*,
https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/cloth-face-cover-guidance.html  (Ex. 11.)

Likewise, the American College of Chest Physicians, American Lung Association, American Thoracic Society and COPD Foundation recommend the use of masks to "to decrease the risk of spread of the virus, in particular by asymptomatic individuals who may be transmitting viral particles via respiratory droplets when they cough, sneeze, sing, talk and even breathe."[20]  In a joint statement, these leading medical groups also confirmed that individuals with normal lungs and even many individuals with underlying chronic lung disease should be able to wear face coverings without trouble.  Even the Wall Street Journal acknowledges that face coverings help reduce the transmission of droplets and help stop the spread of COVID-19.[21]  Reviewing scientific studies from around the world, the Journal stated that "researchers from around the world have found many different kinds of masks can significantly reduce the spread of coronavirus" and "[m]any researchers are also now examining the possibility that masks might offer some personal protection from the virus, despite initial thinking that they mostly protect others."[22]  Studies and epidemiological models from leading experts likewise indicate that the widespread use of masks safely and meaningfully reduces COVID-

---

[20] American Lung Association, American College of Chest Physicians, American Lung Association, American Thoracic Society and COPD Foundation Statement on Importance of Patients with Chronic Lung Disease Wearing Facial Coverings, https://www.lung.org/media/press-releases/accp-ala-ats-copd-foundation-urge-masks-for-all  (Ex. 12.)

[21] *Face Masks Really Do Matter. The Scientific Evidence Is Growing*, WALL STREET JOURNAL, https://www.wsj.com/articles/face-masks-really-do-matter-the-scientific-evidence-is-growing-11595083298  (Ex. 13.)

[22] *Id.*

19 transmission, hospitalization, and death, especially indoors, where there is less air circulation.[23]

This general guidance extends to the school setting.  As the CDC has explained, while "[t]he use of masks in educational settings may present challenges, particularly for younger students and students with special healthcare or educational needs," masks remain "important to help slow the spread of COVID-19" in such settings and are "strongly encouraged" as a mitigation measure, along with other "important mitigation strategies" such as social distancing.[24]  These measures are critical to the protection of not only the children themselves, but also the many others who care for or otherwise come into contact with them.  Indeed, COVID-19 is a highly communicable disease; even if children were categorically and indisputably immune from COVID-19 symptoms, discouraging infection in children nevertheless serves to limit the spread of the virus and the manifest harm that would present to

---

[23] See Steffen Eikenberry, et al., *To mask or not to mask: Modeling the potential for face mask use by the general public to curtail the COVID-19 pandemic*, 5 INFECT DIS MODEL 293 (Apr. 21, 2020), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7186508/  (Ex. 14.); Trisha Greenhalgh, et al., *Face masks for the public during the covid-19 crisis*, BMJ 369 (Apr. 9, 2020) https://www.bmj.com/content/369/bmj.m1435  (Ex. 15.); Mingming Liang, et al., *Efficacy of face mask in preventing respiratory virus transmission: A systematic review and meta-analysis*, 36 Travel Medicine and Infectious Disease 10175 (May 28, 2020) https://www.sciencedirect.com/science/article/pii/S1477893920302301  (Ex. 16.)

[24] CDC, *Guidance for K-12 School Administrators on the Use of Masks in Schools*, https://www.cdc.gov/coronavirus/2019-ncov/community/schools-childcare/cloth-face-cover.html  (Ex. 17.)

the remaining, vast majority of the population.[25]  And while the ever-mounting number of individuals killed by this virus is troubling enough, an exclusive focus on fatality rates—of children or adults—obscures COVID-19's true potential impact, which is suspected to have long-term effects on those who technically survive an infection.[26]  In addition to public health consequences, experience has shown significant economic effects associated with outbreaks and the presence of even a few positive cases in myriad public settings.

### B.    The State of Michigan's response to the COVID-19 pandemic.

On March 10, 2020, in response to the growing pandemic in Michigan, Governor Whitmer declared a state of emergency and invoked the emergency powers available to the Governor under Michigan law.[27]  Soon thereafter, Robert Gordon, the Director of Michigan's Department of Health and Human Services, began issuing emergency orders under Michigan's Public Health Code, Mich. Comp. Laws §§ 333.1101, *et. seq.*  Beginning on March 23, 2020 and up through the present, Director Gordon has issued numerous public orders on a number of issues

---

[25] CDC, *Help Stop the Spread of COVID-19 in Children* (Sept. 17, 2020), https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/children/protect-children.html  (Ex. 18.)

[26] CDC, *Long-Term Effects of COVID-19* (Sept. 16, 2020), https://www.cdc.gov/coronavirus/2019-ncov/long-term-effects.html  (Ex. 19.)

[27] All executive orders can be found at https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705---,00.html.

related to the pandemic, including requirements regarding masks and distancing

for gatherings and requirements regarding COVID-19 testing in certain contexts.[28]

On October 5, 2020, Director Gordon issued a public health order limiting

gatherings of persons and requiring that face coverings be worn by all persons over

the age of five in schools, with some exceptions for certain persons and activities.[29]

That order was rescinded by another public health order on October 9, 2020, which

maintained the face covering requirement and served as the basis for Plaintiff's

objections comprising this lawsuit.[30]

Since this lawsuit was filed, Michigan's COVID-19 crisis has worsened.  From

October 1, 2020 to November 15, 2020, Michigan's per-capita case count has

increased fivefold.[31]  Hospitalizations have increased over 450% during this time.[32]

Although 78% more tests were being administered at the end of this same period,

the rate of positive test results increased by 225%; in other words, Michigan's

---

[28] All DHHS public health orders can be found at
https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-533660--,00.html

[29] Emergency Order Under Mich. Comp. Laws § 333.2253 – Gathering Prohibition
and Mask Order dated October 5, 2020,
https://www.michigan.gov/documents/coronavirus/MDHHS_epidemic_order_-
_Gatherings_masks_bars_sports_-_FINAL_704287_7.pdf  (Ex. 20.)

[30] Emergency Order Under Mich. Comp. Laws § 333.2253 – Gathering Prohibition
and Mask Order dated October 9, 2020,
https://www.michigan.gov/coronavirus/0,9753,7-406-98178_98455-541962--,00.html
(Ex. 21.)

[31] Emergency Order Under Mich. Comp. Laws § 333.2253 – Gatherings and Face
Mask Order dated November 15, 2020, at 1.  (Ex. 22.)

[32] *Id.* at 2.

increased rate of COVID-19 infections can by no means be attributed only to an increased rate of testing.[33]  And, as winter approaches, the practical unavailability of outdoor gatherings will drive cases higher if Michiganders do not take action.

Accordingly, on November 15, 2020, Director Gordon issued an updated order imposing new emergency procedures to mitigate the spread of COVID-19, set to take effect on November 18, 2020 for a three-week period.[34]  The order imposes a variety of limits on gatherings, but, notably, it does not materially alter Plaintiff's obligations regarding facial coverings.[35]  And, whereas the October 9 order regulated most indoor gatherings by reference to the structure's occupancy limits, the November 15 order requires remote learning for high school-aged students and imposes a manageable six-foot distancing rule for students in 8th grade and younger.[36]

### C.     Ottawa County's Department of Public Health closes Plaintiff's in-person schooling operations, citing multiple violations of the order.

After an evidentiary hearing on Plaintiff's motion for injunctive relief, this Court summarized the factual background as follows:

> Libertas, through witnesses at the hearing, established that it did not require students, teachers or staff to wear face coverings when school restarted in the fall of 2020.  Libertas' return to school plan

---

[33] *Id.* at 1.

[34] *See generally id.*

[35] *Id.*

[36] *Id.*

states "[I]f so desired, parents may choose to send their children to
school with masks.  However, Libertas faculty, staff and
administration are not required to enforce the wearing of masks."
(ECF No. 2-3 PageID.91.)

The Ottawa County Department of Public Health contacted
Libertas about the COVID-19 measures.  During the first week of
school in early September, Defendant Marcia Mansaray spoke with
Robert Davis, the headmaster at Libertas.  Mansaray informed Davis
that an anonymous person alleged that students at Libertas were not
wearing face coverings.  After Ottawa County received a second
anonymous tip, Mansaray sent an email to Davis sometime around
September 22. (ECF No. 1-6 PageID.48-49.)  Mansaray informed Davis
about the requirement for face coverings.  Mansaray concluded the
email with a request and a warning.  She requested "cooperation and
enforcement of these requirements." (PageID.48.)  She warned that if
additional complaints were made, there might be "enforcement from
state or local officials."  (PageID.49.)  She further warned that that
"one or more positive cases of COVID-19 in the school building will
necessitate that the school follow these requirements." (*Id.*)

(ECF No. 30, 11/3/20 Order at 2–3, PageID.499-500.)

After warning Plaintiff, Ottawa County negotiated with it, and the two

agreed that the County would not pursue enforcement if Plaintiff filed the instant

lawsuit, which it did.  (ECF No. 1-5, 10/16/20 Email, PageID.45.)

Subsequently, three significant revelations came to light:  In addition to

refusing to comply with the portion of the order regarding masks, Plaintiff also

refused to properly distance its students and faculty from one other, (ECF No. 30,

11/3/20 Order at 4, PageID.502); at least two of Plaintiff's teachers contracted

COVID-19 and had "close contact" with students or faculty at the school, (*id.* at 16,

PageID.513); and Plaintiff refused to participate in "contact tracing," a reporting

measure designed to help public health officials identify where and how COVID-19

13

is spreading, (*id.* at 7, PageID.504; *id.* at 16, PageID.513).  Accordingly, the County

shut down the school.  (*Id.* at 11, PageID.508.)

Due to Plaintiff's decision not to serve the State Defendants (a term that

includes defendants Governor Whitmer, Attorney General Nessel, and Director

Gordon), this Court proceeded to resolve Plaintiff's motion for temporary restraining

order and two motions for preliminary injunction with only the County's

participation as a defendant.  (ECF No. 7, 10/19/20 Order, PageID.106; ECF No. 30,

11/3/20 Order, PageID.498.)  In addition to determining that Plaintiff had not

demonstrated entitlement to injunctive relief at that stage, this Court determined

that it

> will also abstain from resolving Libertas' constitutional claims as those
> claims arise from an unsettled state law or act.  There is sufficient
> time for the state law issues to be raised in State courts.  And, the
> manner in which the State courts might resolve the dispute would
> eliminate the need for the Court to reach any constitutional
> determination.

(ECF No. 30, 11/3/20 Order at 1–2, PageID.498-99.)  While the hearing was

underway, Plaintiff served Attorney General Nessel.  (ECF No. 24.)  After this

Court denied Plaintiff's request for relief and issued its order of abstention, Plaintiff

completed service on Governor Whitmer and Director Gordon.  (ECF Nos. 34, 35.)

The State Defendants submit this motion and brief in lieu of an answer,

asserting their sovereign immunity as to the state-law claims in Counts IV and V

pursuant to the Eleventh Amendment.  They also ask this Court to extend its order

of abstention to the State Defendants.  Finally, in the event that this Court reaches

the merits of the claims for which the State Defendants do not have Eleventh

Amendment immunity, the State Defendants ask this Court to dismiss those claims

on their merits.

## ARGUMENT

I.    **Governor Whitmer, Director Gordon, and Attorney General Nessel are entitled to Eleventh Amendment immunity regarding Plaintiff's state-law claims.**

Under the Eleventh Amendment, Governor Whitmer, Director Gordon, and

Attorney General Nessel (collectively, the State Defendants) are immune from suit

in this Court as to the state-law claims set forth in Plaintiff's Counts IV and V.

Those counts allege that the statute invoked by Director Gordon when issuing his

orders violates Michigan's non-delegation doctrine and that the issuance and

enforcement of the orders violates Plaintiff's procedural due process rights under

Michigan's constitution.  Accordingly, the State Defendants must be dismissed as to

those claims.

Sovereign immunity prevents this Court from exercising jurisdiction over

Plaintiff's claims for equitable relief under the Michigan Constitution.  "[A] claim

that state officials violated state law in carrying out their official responsibilities is

a claim against the [s]tate that is protected by the Eleventh Amendment*."*

*Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 121 (1984).  Whether

immunity exists in a given case is a question of constitutional law.  *Ernst v. Rising*,

427 F.3d 351, 359 (6th Cir. 2005).  "[B]ecause Eleventh Amendment issues are

jurisdictional in nature," the State Defendants bring this portion of their motion

under Fed. R. Civ. P. 12(b)(1). *Ladd v. Marchbanks*, 971 F.3d 574, 577 n.2 (6th Cir. 2020) (quoting *Russell v. Lundergan-Grimes*, 784 1037, 1046 (6th Cir. 2015)).

The Eleventh Amendment prohibits suits naming the state or one of its agencies or departments as the defendant, regardless of the nature of the relief sought. *Pennhurst*, 465 U.S. at 100; *see also Ernst*, 427 F.3d at 368 ("[T]he states' constitutional immunity from suit prohibits *all* state-law claims filed against a [s]tate in federal court, whether those claims are monetary or injunctive in nature."). This immunity from suit extends to state officials when the lawsuit is in fact against the state. *Id.* at 101–02. Under *Ex Parte Young*, 209 U.S. 123 (1908), a federal court may issue prospective injunctive and declaratory relief compelling a state official to comply with *federal* law. *See Edelman v. Jordan*, 415 U.S. 651, 664 (1974). But that exception does not extend to such relief based on violations of state law. *Pennhurst*, 465 U.S. at 106; *Freeman v. Michigan Dep't of State*, 808 F.2d 1174, 1179 (6th Cir. 1987). This conclusion applies even if supplemental jurisdiction otherwise exists. *McNeilus Truck & Mfg., Inc. v. Ohio ex rel. Montgomery*, 226 F.3d 429, 438 (6th Cir. 2000).

Accordingly, the State Defendants must be dismissed as to the state-law claims set forth in Counts IV and V.[37]

---

[37] It bears noting that, while the State Defendants are not the only parties against whom Plaintiff brings these state-law claims, the claims cannot go forward in their absence under Federal Rule of Civil Procedure 19, given Plaintiff's inability to obtain complete relief in the State Defendants' absence, the prejudice the State Defendants would suffer from this Court proceeding on the claims without them,

**II.     This Court should abstain from deciding any of Plaintiff's claims.**

Given the gravity of the state law questions, the unique factual and legal

landscape in which this case appears, and the litigation regarding Director Gordon's

authority already pending in State court, this Court should extend its extant

abstention order to the State Defendants under either of the two following theories

of abstention.

**A.     *Pullman* abstention**

First, this Court should abstain from considering Plaintiff's claims under the

*Pullman* abstention doctrine.  In *Railroad Commission of Texas v. Pullman Co.*, 312

U.S. 496, 499-500 (1941), the Supreme Court held that, when a challenged state

statute requires interpretation by the judiciary, the "last word" on the meaning of

the statute belongs to the state courts.  The Court held:

---

and Plaintiff's ability to seek complete relief on their claims through Michigan's
courts. *See, e.g.*, *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008)
(explaining that under Rule 19, "[a] case may not proceed when a required-entity
sovereign is not amenable to suit"); *Mine Safety Appliances Co. v. Forrestal*, 326
U.S. 371, 373–75 (1945) (dismissing an action where the Under Secretary of the
Navy was sued in his official capacity, because the Government was a required
entity that could not be joined when it withheld consent to be sued); *Minnesota v.
United States*, 305 U.S. 382, 386–88 (1939) (dismissing the action for nonjoinder of a
required entity where the United States was the owner of the land in question but
had not consented to suit); *Stand Up for California! v. U.S. Dep't of the Interior*, 204
F. Supp. 3d 212, 251–254 (D.D.C. 2016) (dismissing claims implicating state law
given necessity of state as a defendant and inability to join it as such due to its
Eleventh Amendment immunity); *Hartley Co. v. JF Acquisition, LLC*, No. 15-cv-94,
2017 WL 1628529, at *4–5 (S.D. Ohio May 1, 2017) (concluding dismissal was
warranted under Rule 19 in light of state entity's assertion of sovereign immunity).

> In this situation a federal court of equity is asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication.  The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court.  The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication.

*Id.* at 500 (internal citations omitted).  In sum, "the federal courts should not adjudicate the constitutionality of state enactments fairly open to interpretation until the state courts have been afforded a reasonable opportunity to pass upon them."  *Harrison v. NAACP*, 360 U.S. 167, 176 (1959).  This "well-established procedure" promotes and protects federalism and it "spares the federal courts of unnecessary constitutional adjudication."  *Id.* at 176–77 (noting that *Pullman* abstention "is aimed at the avoidance of unnecessary interference by the federal courts with proper and validly administered state concerns, a course so essential to the balanced working of our federal system.").

"In cases involving a facial challenge to a statute, the pivotal question in determining whether abstention is appropriate is whether the statute is 'fairly subject to an interpretation which will render unnecessary or substantially modify the federal constitutional question.'"  *City of Houston, Tex. v. Hill*, 482 U.S. 451, 468 (1987) (quoting *Harman v. Forssenius*, 380 U.S. 528, 534–35 (1965)).

As this Court has already recognized, *Pullman* abstention is appropriate in this case.  (ECF No. 30, 11/3/20 Order at 24–27, PageID.521–24.)  The state statute at the heart of Plaintiff's claims—Mich. Comp. Laws § 333.2253—"has not yet been interpreted by any state court," (*id.*, PageID.524), and Plaintiff raises a challenge to

18

its compatibility with the Michigan constitution under the newly defined non-delegation doctrine set forth in *In re Certified Questions*, ___ N.W.2d ___, 2020 WL 5877599 (Mich. Oct. 2, 2020).  The task at hand thus requires a nuanced application of a state-law constitutional doctrine to an uninterpreted state statute.  This case presents an interpretive issue wrapped in a state-law constitutional question.  These are matters duly left to Michigan's courts.

Further, a ruling by this Court on the Public Health Code would be "a tentative answer which may be displaced tomorrow by a state adjudication." *Pullman*, 312 U.S. at 499–500; *see also Lake Carriers' Ass'n v. MacMullan*, 406 U.S. 498, 511 (1972) (affirming abstention in a case where a Michigan statute "has not been construed in any Michigan court, and, as appellants themselves suggest in attacking it for vagueness, its terms are far from clear in particulars").  At least one challenge to Director Gordon's orders is currently pending in Michigan's courts. *Semlow Peak Performance Chiropractic v. Whitmer*, No. 20-206-MZ (Mich. Ct. Claims).

Finally, abstaining would not "involve the abdication of federal jurisdiction, but only the postponement of its exercise" while "serv[ing] the policy of comity inherent in the doctrine of abstention" and "spar[ing] the federal courts of unnecessary constitutional adjudication."  *Harrison*, 360 U.S. at 176–77.  Indeed, the manner in which Plaintiff's uncharted state-law questions are resolved may very well eliminate the need for any determination on its federal constitutional challenges.  (ECF No. 30, 10/3/20 Order at 27, PageID.524.)  The doctrine of

constitutional avoidance counsels against this Court moving forward with federal claims that may prove purely hypothetical.  *See Torres v. Precision Industries, Inc.*, 938 F.3d 752, 756-57 (6th Cir. 2019).  Accordingly, under *Pullman* abstention, this Court should refrain from reaching any of Plaintiff's claims.

### B.    *Thibodaux abstention*

In the alternative, this Court should abstain from considering Plaintiff's claims under the *Thibodaux* abstention doctrine.  Although similar to *Pullman* abstention, *Thibodaux* abstention is more concerned with the type of state law at issue and the inherent "localness" of the issues.  *See Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 27–28 (1959).  The Supreme Court has advised federal district courts to invoke *Thibodaux* abstention "where there have been presented difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case then at bar."  *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 814 (1976).

In *Thibodaux*, the Supreme Court reviewed a Louisiana district court's decision to abstain from ruling on the constitutionality of a Louisiana state law regarding eminent domain when the State's Attorney General and cities in the State disagreed about the limits of eminent domain power.  *Thibodaux*, 360 U.S. at 30.  The eminent domain power in question derived from a State statute that had never before been considered by the State courts.  *Id.*  The district court stayed the case and sought a declaratory ruling from the Louisiana Supreme Court.  *Id.*  The

United States Supreme Court affirmed the decision of the district court to abstain, reasoning that "[i]nformed local courts may find meaning not discernible to the outsider" and that rendering a decision on the scope of the State statute may bind the litigants in the lawsuit "whereas the rights of all other litigants would be thereafter governed by a decision of the Supreme Court of Louisiana [which could be] quite different from ours." *Id.*

In this case, this Court should defer to Michigan's state courts on Count IV. Importantly, the challenged sections of the Public Health Code are related to police powers, which are inherent to the sovereignty of the State. *Id.* at 30. A once-in-a-century pandemic necessitates the use of these rarely invoked or reviewed State statutes, which are peculiar to the State of Michigan. The statute at issue provides the Director power to protect Michigan residents when their health, safety, and wellbeing is threatened. The constitutionality of that power under Michigan's non-delegation doctrine is a question best left to the Michigan courts. Indeed, the COVID-19 pandemic and the emergency powers utilized by the State to combat it "present[ ] difficult questions of state law bearing on policy problems of *substantial* public import whose importance *transcends the result in the case . . . at bar.*" *Colorado River*, 424 U.S. at 814 (emphasis added). This Court should abstain from exercising jurisdiction over Count IV under *Thibodaux*—and, given the constitutional-avoidance considerations noted above, it should likewise abstain from resolving Plaintiff's federal constitutional challenges.

**III.    If this Court declines to abstain from exercising jurisdiction over Plaintiff's federal claims against the State Defendants, it should dismiss them on their merits under Rule 12(b)(6).**

As discussed, the Eleventh Amendment bars Plaintiff's state-law claims against the State Defendants in this forum.  Accordingly, although the State Defendants believe those claims lack merit and warrant dismissal as a matter of law, they will refrain from presenting those arguments here.  As also discussed, multiple strains of abstention doctrine counsel against this Court entertaining Plaintiff's federal constitutional claims against the State Defendants on their merits.  Should this Court nonetheless choose to reach those claims, however, it will find no cognizable claim for relief.

Under Fed. R. Civ. P. 12(b)(6), "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (cleaned up).  This "plausibility" review is "a context-specific task" that requires the reviewing court to determine whether the plaintiff has not just "alleged," but pleaded facts sufficient to "show[ ]," an entitlement to relief that is actually plausible, and not merely "conceivable" or "possible."  *Id*. at 679, 680. "[F]acts that are merely consistent with a defendant's liability" are not enough.  *Id*. at 678. And in making this assessment, courts are only to consider facts that are truly well pleaded: they are not to take as true "legal conclusions," including when "couched as a factual allegation," nor "mere conclusory statements" or "naked assertions devoid of further factual enhancement."  *Id*. at 678–79 (cleaned up).

22

## A.   Plaintiff's federal constitutional claims cannot survive *Jacobson*.

Plaintiff raises a number of claims under the United States Constitution,
asserting that Director Gordon's orders violated certain of its rights.

Among other deficiencies, Plaintiff's claims cannot survive the unique
historical context in which they arise and the exigent demands that attend it.
Faced with "great danger[ ]," state actors are permitted great latitude to secure the
public health.  *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11, 29 (1905);
*see also S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14
(2020) (ROBERTS, C.J., concurring) (recognizing state officials' "broad" latitude in
dealing with COVID-19 restrictions).  As *Jacobson* and *South Bay* reflect, the
Supreme Court, recognizing the separation of powers and the limits on the judiciary
to invade the authority of a co-equal branch, has long refused to "usurp the
functions of another branch of government" by second-guessing the executive's
exercise of police power in such circumstances.  *Jacobson*, 197 U.S. at 28; *see also S.
Bay United Pentecostal Church*, 140 S. Ct. at 1614 (2020) (ROBERTS, C.J.,
concurring) (observing that state officials "should not be subject to second-guessing
by an unelected federal judiciary, which lacks the background, competence, and
expertise to assess public health and is not accountable to the people" (internal
quotations omitted)); *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*,
814 F. App'x 125, 127 (6th Cir. 2020) (*LIFFT*) (citing *Jacobson* and stating, "[T]he
police power retained by the states empowers state officials to address pandemics
such as COVID-19 largely without interference from the courts.").

Since the start of the COVID-19 pandemic, courts around the country have applied *Jacobson*'s deferential standard to orders intended to combat the virus that are alleged to implicate enumerated constitutional rights.  As the Sixth Circuit has summarized, *Jacobson*'s "century-old historical principle has been reaffirmed just this year by a chorus of judicial voices, including our own." *LIFFT*, 814 F. App'x at 127 (collecting illustrative cases, including under the First Amendment); *see, e.g.*, *S. Bay United Pentecostal Church*, 140 S. Ct. at 1614 (ROBERTS, C.J., concurring) (recognizing *Jacobson's* applicability to First Amendment free-exercise claims); *In re Abbott*, 954 F.3d 772, 784 (5th Cir. 2020) (applying *Jacobson* to substantive due process claims); *Geller v. de Blasio*, No. 20-CV-3566 (DLC), 2020 WL 2520711, at *3 (S.D.N.Y. May 18, 2020) (applying *Jacobson* to First Amendment speech claims challenging the restrictions on gatherings for political protests).  Thus, while the State's authority during this pandemic is not limitless, *Jacobson* mandates that courts abstain from second-guessing exercises of police power unless there is "no real or substantial relation" between its actions and public health and safety, or the restrictions are "beyond all question, a plain palpable invasion of rights." *Jacobson*, 197 U.S. at 31.

As the Sixth Circuit has explained, overcoming *Jacobson* deference is "no easy task." *LIFFT*, 814 F. App'x at 128.  The challenged restriction is presumed constitutional, and it is "incumbent upon Plaintiffs to negate 'every conceivable basis which might support' it" under a rational basis review.  *LIFFT*, 814 Fed. App'x at 128 (quoting *Armour v. City of Indianapolis*, 566 U.S. 673, 681 (2012)).  "Under

this test, the [State Defendants'] action is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data"— "[e]specially so . . . in the case of a public health crisis like the one presented by COVID-19, where Michigan's latitude must be especially broad." *LIFFT*, 814 Fed. App'x at 128; *see also id.* ("[T]he relevant standard merely requires rational speculation that offers conceivable support to the [Director's] order," and indeed, "the [Director] was not required to explain [the rationale] at all, let alone exhaustively" (internal quotation marks omitted)).  This analysis thus requires Plaintiff to "disprove all possible justifications for the [o]rder regardless whether those justifications actually motivated the [Director]'s decisionmaking." *Id.* Furthermore, the restriction "need not be the most effective or least restrictive measure possible to attempt to stem the spread of COVID-19." *Id.* at 129.  As this Court has aptly summarized, "[u]nder *Jacobson*, the Court cannot second-guess the executive's power during a pandemic unless the executive promulgates a completely baseless rule." *CH Royal Oak, LLC v. Whitmer*, No. 1:20-cv-570, 2020 WL 4033315, at \*6 (W.D. Mich. July 16, 2020) (citing *LIFFT*).

There is no viable path for Plaintiff around *Jacobson*'s well-settled rule and the great deference it affords to the State Defendants' decisions and actions in response to this pandemic.  Neither the school mask requirement nor any social-distancing measures are "completely baseless." *Id.*  To the contrary, each plainly has a "real or substantial relation" to protecting public health during this pandemic. *Jacobson*, 197 U.S. at 31.  As detailed *supra*, there is well beyond the requisite

"rational speculation" to support the conclusion that distancing and the wearing of masks, in public settings in general and in school settings in particular, constitute important and appropriate interventions to mitigate the spread of COVID-19.

Nor are these measures "beyond all question, a plain, palpable invasion" of Plaintiff's rights. *Jacobson*, 197 U.S. at 31. Plaintiff does not allege—and cannot demonstrate—a fundamental right to mask-free schools where distancing is not observed. And even if it could, *Jacobson* is clear that its deferential standard of review applies to alleged infringements of "*all* rights," including those "secured by the fundamental law." *Jacobson*, 197 U.S. at 26, 31 (emphasis added). Correspondingly, courts have frequently upheld against First Amendment challenges more extreme measures taken in response to the public health needs created by the pandemic, including stay-home orders and temporary bans on *any* social gatherings. *See, e.g.*, *Geller*, 2020 WL 2520711, at *3 (declining to enjoin New York City officials from enforcing a restriction on all non-essential gatherings where the plaintiff sought to conduct a political protest and raised First Amendment speech claims).[38]

---

[38] This includes the rejection of challenges under the religion clauses of the First Amendment. *See, e.g.*, *South Bay*, *supra*; *Cavalry Chapel Dayton Valley v. Sisolak*, No. 19A1070, __ S. Ct. __, 2020 WL 4251360 (July 24, 2020); *Elim Romanian Pentecostal Church v. Pritzker*, 962 F.3d 341 (7th Cir. June 16, 2020); *Robinson v. Murphy*, No. CV 20-5420, 2020 WL 5884801 (D.N.J. Oct. 2, 2020); *Harvest Rock Church, Inc. v. Newsom*, No. LACV206414JGBKKX, 2020 WL 5265564 (C.D. Cal. Sept. 2, 2020); *Whitsitt v. Newsom*, No. 220CV00691JAMCKDPS, 2020 WL 4818780 (E.D. Cal. Aug. 19, 2020); *High Plains Harvest Church v. Polis*, No. 1:20-CV-01480-RM-MEH, 2020 WL 4582720 (D. Colo. Aug. 10, 2020); *Cavalry Chapel of Bangor v.*

Moreover, as discussed in greater detail below, the distancing and school mask requirements are generally applicable and content-neutral.  Traditional constitutional analyses of these claims confirms this application of *Jacobson*.  To the extent that *Jacobson* does not apply, these claims nevertheless fail.  Thus, Plaintiff cannot articulate a constitutional violation at all—let alone a "plain" and "palpable" violation "beyond all question."

## B.   Even absent *Jacobson*, Plaintiff's federal constitutional claims fail as a matter of law.

### 1.   Plaintiff's Count III (religious freedom) is meritless.

The State Defendants first address Plaintiff's Count III, because its other claims are inextricably bound up with this one, as explained more fully below.  In short, the orders, at most, only incidentally burden Plaintiff, and Plaintiff's analysis

---

*Mills*, No. 1:20-cv-00156-NT, 2020 WL 2310913 (D. Maine May 9, 2020); *Cross Culture Christian Center v. Newsom*, 2020 WL 2121111 (E.D. Cal. May 5, 2020); *Cassell v. Snyders*, No. 20 C 50153, 2020 WL 2112374 (N.D. Ill. May 3, 2020).

In *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020), and *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020), the Sixth Circuit determined that, despite the very deferential standard of *Jacobson*, the plaintiffs were likely to succeed on the merits of their claims challenging a total ban on group religious services in Kentucky.  Quite plainly, those cases are miles from this one; Director Gordon's orders do not impose a complete ban on the exercise of fundamental constitutional rights, and a generally applicable school mask requirement is in no way similar, in kind or severity, to a categorical prohibition on religious gatherings.

27

is fatally flawed for failure to appreciate this fact.  This conclusion, once reached,

helps to dispense with Plaintiff's two other civil-rights claims. [39]

Plaintiff asserts that the orders impinge upon its right to religious freedom in

a handful of ways.  It suggests that compliance with the orders will "jeopardize the

integrity of [its] curriculum" by requiring it to "remove music, choir, recitations,

praise, worship, and adoration from its curriculum."  It also asserts that wearing

masks "contradicts [its] religious beliefs."  Plaintiff further suggests—incorrectly—

that the now-superseded orders distinguish between non-secular and secular

entities, such that secular entities would *not* have to observe similar distancing

requirement if their school had fewer than 500 people.  (*Id.* ("In secular settings,

however, the state is permitting capacities up to 500 people—far below Libertas's

maximum headcount for the entire association.").) [40]

The Free Exercise Clause of the First Amendment to the United States

Constitution applies to the States through the Fourteenth Amendment.  *Church of*

*the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993).  "The free

---

[39] *Accord Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez*, 561 U.S. 661, 681 (2010)  ("[I]t would be anomalous for a restriction on speech to survive constitutional review under our limited-public-forum test only to be invalidated as an impermissible infringement of expressive association.").

[40] In fact, the order imposed sharp limitations on gatherings up to 500 people regardless of whether they are secular, permitting gatherings of that size only to the extent that certain distancing requirements can be observed.  (ECF No. 1-2, 10/9/20 Order at § 2(b)(3), PageID.34.)  Plaintiff refuses to distance altogether; the comparison it urges is therefore not relevant, in addition to being unfounded in the record.  In any event, this order no longer controls.

exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires." *Emp't Div., Dep't of Human Resources of Oregon v. Smith*, 494 U.S. 872, 877 (1990). "The Free Exercise Clause 'protects religious observers against unequal treatment' and subjects to the strictest scrutiny laws that target the religious for 'special disabilities' based on their 'religious status.'" *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S. Ct. 2012, 2019 (2017).

The Supreme Court has "long recognized a distinction between the freedom of individual belief, which is absolute, and the freedom of individual conduct, which is not." *Bowen v. Roy*, 476 U.S. 693, 699 (1986). The Free Exercise Clause "cannot be understood to require the Government to conduct its own internal affairs in ways that comport with the religious beliefs of particular citizens." *Id.* But the Clause is implicated "if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *City of Hialeah*, 508 U.S. at 532; *see also Prater v. City of Burnside, Kentucky*, 289 F.3d 417, 427 (6th Cir. 2002) (holding that the Clause protects the right to engage in conduct motivated by religious belief).

Thus, although laws that "target religious belief" or intentionally "infringe upon or restrict practices because of their religious motivation" raise serious constitutional concerns, "a law that is neutral and of general applicability need not be justified by a compelling government interest even if that law has the incidental effect of burdening a particular religious practice." *City of Hialeah*, 508 U.S. at 531,

533.  In *Trinity Lutheran*, the Court noted that "[i]n recent years, when this Court has rejected free exercise challenges, the laws in question have been neutral and generally applicable without regard to religion."  137 S. Ct. at 2020.  Indeed, neutral and generally applicable laws are presumed constitutional even when they encroach on an individual's fundamental constitutional rights.  *Employment Division*, 494 U.S. at 878–879; *New Doe Child #1 v. Congress of the United States*, 891 F.3d 578, 591–593 (6th Cir. 2018).

Here, slowing the spread of COVID-19 and protecting the public health doubtless is a compelling government interest.  And the requirements in the Director's public health orders further that interest.  Again, the CDC has made clear that schools present unique opportunities to spread of the coronavirus, and mitigation strategies—facial coverings and distancing being crucial components— are appropriate and necessary.[41]  Accordingly, the Director's orders have mandated that all persons in school settings wear masks and observe distancing to slow the spread.

The public health justifications for these measures are ample and clear.  And in imposing these measures, the orders by no means "target the religious for special disabilities based on their religious status."  *Trinity Lutheran*, 137 S. Ct. at 2019 (internal quotation marks omitted).  The orders require masks and distancing in all

---

[41] *See* notes 6–7, 19–21, 24–25 *supra*.

schools, public and private, religious and secular.  Stated differently, requirements are neutral and generally applicable.

At bottom, there is nothing in the Director's orders that precludes Plaintiff from operating its religious school consistent with its members' religious beliefs. Plaintiff simply has to operate the school consistent with the order's requirement that masks be worn by all persons over the age of two and that persons from different households observe six-foot distancing requirements.  This may be less than ideal from Plaintiff's perspective, but it does not mean that Plaintiff's rights have been infringed.

Plaintiff may disagree that the mask and distancing requirements are necessary to protect the public health.  But that does not give rise to an actionable claim for relief from this Court.  As Chief Justice Roberts aptly explained when concurring in the denial of immediate relief from attendance limitations on places of religious worship, the exercise of state police power to protect the public health "is a dynamic and fact-intensive matter" that "[o]ur Constitution principally entrusts  . . . to the politically accountable officials of the States".  *South Bay*, 140 S. Ct. at 1613–14 (ROBERTS, C.J., concurring).  The States' exercise of such power is not "subject to second-guessing by an unelected federal judiciary," especially where, as here, they "undertake to act in areas fraught with medical and scientific uncertainties." *Id.* (cleaned up).  As the Sixth Circuit put it:

> Shaping the precise contours of public health measures entails some difficult line-drawing.  Our Constitution wisely leaves that task to officials directly accountable to the people.

\*      \*      \*

> Crises like COVID-19 can call for quick, decisive measures to save
> lives. Yet those measures can have extreme costs—costs that are often
> not borne evenly. The decision to impose those costs rests with the
> political branches of government . . . .

*LIFFT,* 814 Fed. App'x at 129–30.

In other words, the gravamen of Plaintiff's constitutional challenges treads on the level of policy and whether it is wise and effective.  Such a challenge is a far cry from a plausible constitutional violation meriting the intervention of a federal court.  Accordingly, this Court should dismiss Plaintiff's Count III.

### 2.      Plaintiff's Count I (freedom to associate) is meritless.

Plaintiff—whose complaint does not include relevant, particularized factual allegations on this point—also argues that the orders burden its right to freely associate, because compliance with the orders will force it to "turn certain of its students and teachers away," owing to a lack of space necessary to accommodate all of its students in compliance with the order.  (ECF No. 18, Pl. Mot., p. 20, PageID.322.)

The Supreme Court has recognized a "right of association" in certain circumstances. *Roberts v. United States Jaycees,* 468 U.S. 609 (1984).  Relevant here, the Court has recognized that "implicit in the right to engage in activities protected by the First Amendment" is "a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational,

religious, and cultural ends" (i.e., "expressive association").  *Id.* at 622.[42]  Certainly,

Plaintiff and its members engage in expressive association.  *See Boy Scouts of Am.*

*v. Dale*, 530 U.S. 640, 650 (2000) ("It seems indisputable that an association that

seeks to transmit . . . a system of values engages in expressive activity.").

Crucially, however, the Director's orders *do not target expressive or*

*associative conduct*, which reroutes this Court's inquiry to one of rational basis.  *See*

*Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v.*

*Martinez*, 561 U.S. 661, 695 (2010) (applying "incidental effect" safety valve in

rejecting expressive-association claim).  The contested portions of the orders deal

with facial coverings and social distancing.  The only reason these orders result in

Plaintiff's alleged inability to comply is the square footage of Plaintiff's facilities—

*not* the nature of Plaintiff's activities.  The orders therefore bear no relationship to

Plaintiff's right to associate, and therefore the orders, having a rational basis, are

constitutionally permissible.  As the Supreme Court has recognized,

> [i]t is possible to find some kernel of expression in almost every activity
> a person undertakes—for example, walking down the street or meeting
> one's friends at a shopping mall—but such a kernel is not sufficient to
> bring the activity within the protection of the First Amendment.

*City of Dallas v. Stanglin*, 490 U.S. 19, 25 (1989).

---

[42] A community that, by Plaintiff's definition, comprises over 250 students, along
with untold faculty, staff, and parents, does not come within the ambit of the *other*
form of associative rights, i.e., "intimate association."  *See U.S. Citizens Ass'n v.*
*Sebelius*, 705 F.3d 588, 598 (6th Cir. 2013).

The order here places no limits whatsoever on association in terms of who can associate with whom; instead, it regulates only the density of *all* associations.[43] One's right to expressive association is a vehicle to vindicate *other* First Amendment rights, such as speech and religious freedom, *Roberts*, 468 U.S. at 622, and here the nature of the order's effect on the association renders it akin to, at most, a "content neutral" restriction on that First Amendment activity.  Plaintiff's claim is therefore without merit and must be dismissed.

### 3.    Plaintiff's Count II (right to parent) is meritless.

No better is Plaintiffs argument that compliance with the order violates the students' parents' substantive due process right to make decisions concerning care, custody, and control of their children without arbitrary government interference. (ECF No. 1, Compl. ¶¶ 59–67, PageID.13-15; *see also* ECF No. 18, Pl. Br., p. 17, PageID.319 (citing *Schulkers v. Kammer*, 955 F.3d 520, 539–40 (6th Cir. 2020).) This right acknowledges a "private realm of family life which the state cannot enter." *Schulkers*, 955 F.3d at 540 (parenthetically quoting *Moore v. City of E. Cleveland*, 431 U.S. 494, 498–99 (1977).)

This claim fails for the same reason that Plaintiff's other constitutional claims fail—the alleged burden is, at most, incidental to a generally applicable,

---

[43] Plaintiff has clarified that Count I applies only to the distancing guidelines; its explanation for its opposition to the mask mandate does not implicate its associational rights.  (*See* ECF No. 18, Pl. Br., pp. 19–20, PageID.321–22.)

neutral law.  Laws offending this right are those that accomplish their goal "by slicing deeply into the family itself," such as an ordinance that dictates which family members can—and which family members cannot—cohabitate within the same housing unit.  *Moore*, 431 U.S. at 498–99; *see also Troxel v. Granville*, 530 U.S. 57, 66–67 (2000) (invalidating statute that granted a judicial review to any third party wishing to override a parent's visitation decisions concerning her child).  But, as with Plaintiff's associational claim, nothing on the face of the Director's orders purports to impact the right that Plaintiff invokes.  This claim must be dismissed.

### 4.  Plaintiff's Count V (procedural due process) is meritless.

Finally, Plaintiff cannot establish that the orders violate procedural due process.  "The core of due process is the right to notice and a meaningful opportunity to be heard."  *LaChance v. Erickson*, 522 U.S. 262, 266 (1998); *see also Garcia v. Fed. Nat. Mortg. Ass'n*, 782 F.3d 736, 741 (6th Cir. 2015) (opportunity to be heard must take place "at a meaningful time and in a meaningful manner.") (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Plaintiff does not allege that it lacked notice, stating only that it is "entitled to a hearing" to challenge both (1) the applicability of the orders to its school and (2) Ottawa County's decision to enforce the orders.  (ECF No. 1, Compl. ¶ 111, PageID.24–25.)

The Due Process Clause is flexible and calls for such procedural protections as the particular situation demands.  *Fleming v. U.S. Dep't of Agric.*, 713 F.2d 179, 183 (6th Cir. 1983) (citing *Mathews v. Eldridge*, 424 U.S. 319, 334 (1976)).  The first

step in ascertaining a given situation's procedural due process requirements entails a "determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Rest. Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.S. 886, 895 (1961).

Usually, due process requires a pre-deprivation hearing. *Zinermon v. Burch*, 494 U.S. 113, 127 (1990). That said, no hearing is required where the government has issued a generally applicable law or order. *Neinast v. Bd. of Trustees of Columbus Metro. Library*, 346 F.3d 585, 596–97 (6th Cir. 2003) ("Governmental determinations of a general nature that affect all equally do not give rise to a due process right to be heard."). Furthermore, "the failure to provide a pre-deprivation hearing does not violate due process in situations where a government official reasonably believed that immediate action was necessary to eliminate an emergency situation and the government provided adequate post-deprivation process." *United Pet Supply, Inc. v. City of Chattanooga, Tenn.*, 768 F.3d 464, 486 (6th Cir. 2014) (citing *Harris v. City of Akron*, 20 F.3d 1396, 1403–05 (6th Cir. 1994) (demolition of home without notice and hearing did not violate due process where the building inspector believed that the home was "dangerously close" to falling onto the street and another home); *Mithrandir v. Brown,* 37 F.3d 1499, at *2–3 (6th Cir. 1994) (table decision) (confiscation of a prisoner's typewriter without a hearing was justified because a prison guard had been stabbed with a part from the typewriter)). *See also, e.g.*, *Hartman v. Acton*, No. 2:20-CV-1952, 2020 WL 1932896, *7-9 (S.D. Ohio Apr. 21, 2020) (relying on this caselaw in rejecting procedural due process

challenge to COVID-19 business-closure order issued by Ohio's Director of the Department of Health).

As discussed, the Director's order imposes generally applicable requirements. And Plaintiff's complaint contains no factual allegations regarding how the orders themselves—as opposed to their enforcement—constitute a deprivation, such that Plaintiffs were entitled to a hearing prior to, or regarding, the orders' issuance. And as to the enforcement of those requirements against Plaintiff, at the outset, it is noteworthy—and undisputed—that the County was willing to delay enforcement actions until this Court could determine the very questions that Plaintiff raises. In other words, this lawsuit was arranged to function as a pre-deprivation hearing. The County pursued enforcement only after it learned that Plaintiff was exposing its students to two infected teachers *and* refusing to participate in contact tracing. (ECF No. 10-1, Mansaray Aff. ¶¶ 15–19, PageID.189–90.) Plaintiff would have had this Court see its environment differently. (*See* ECF No. 1, Compl. ¶ 79, PageID.17 ("Libertas's safety measures have proven not only adequate, but exceptional. No students have fallen ill from COVID-19 and there have been no asymptomatic positive cases either."); ECF No. 8, Pl. Supp. Br., p. 5, PageID.116.)

This Court should keep all of these circumstances in mind while evaluating Plaintiff's due process claim. *See Fleming*, 713 F.2d at 183. *Mathews v. Eldridge* establishes the four-part test that courts must apply to determine how much process is due. Under that test, courts inquire into the following:

> [1] the private interest that will be affected by the official action;
> [2] the risk of an erroneous deprivation of such interest through the
> procedures used; [3] the probable value, if any, of additional or
> substitute procedural safeguards; and [4] the Government's interest,
> including the function involved and the fiscal and administrative
> burdens that the additional or substitute procedural requirement
> would entail.

*Mathews*, 424 U.S. at 335.

As to the first factor, the temporary closure of a business affects the

livelihoods of its employees, and, in the case of a school, it can affect the livelihoods

of the students' parents. *United Pet Supply*, 768 F.3d at 486. But, again, Plaintiff

had ample opportunity to avoid this closure pending a hearing on its claims, even

while continuing to violate certain portions of the order, simply by communicating

with the County and cooperating with public health officials' efforts to contact-trace.

In any event, none of the remaining factors points to a deprivation of process.

There was little risk of erroneous deprivation. This second *Mathews* factor

asks whether the underlying official action—here, the County's determination that

Plaintiff was violating an order—is constrained in a way that engenders accuracy

and consistency, thereby reducing the need for additional processes. For example,

in *Shoemaker v. City of Howell*, 795 F.3d 553, 561 (6th Cir. 2015), the ordinance at

issue required grass to be kept shorter than eight inches tall, and it posed no risk of

erroneous deprivation; it would be difficult to erroneously determine that grass is

taller than eight inches. When an official is faced with a bright-line, objective

criterion, such as a yardstick measurement, or "elementary accounting," *see Sickles

v. Campbell Cty.*, 501 F.3d 726, 730 (6th Cir. 2007), this factor will tip in favor of the

defendant.  Here, the same types of objective determinations were at play:  Were face coverings worn, or not?  Did the gatherings exceed the specified bright-line density limits, or not?  Did Plaintiff and its employees participate in contact tracing, or did they inexplicably refuse?  And so on.  None of the County's enforcement determinations entailed any subjectivity.  Indeed, Plaintiff publicly admits that it willingly declines to adhere to the orders.  This factor weighs against Plaintiff.

The third *Matthews* factor inquires into "the probable value, if any, of additional or substitute procedural safeguards."  Once again, Plaintiff voluntarily deprived itself of a pre-deprivation hearing regarding the allegations made in its complaint by violating the orders in ways that do not come within the scope of that complaint.  In any event, "it is difficult to see the value of the additional procedural safeguard of a hearing prior to the seizure, given that [Plaintiff] requested a temporary restraining order in the midst of the [deprivation] and its request was denied." *United Pet Supply*, 768 F.3d at 487.

The fourth *Matthews* factor addresses the government's interest, which, in this case, is synonymous with the goal of achieving desirable public health outcomes for all Michigan residents.  Regarding this factor, it is relevant that Plaintiff does not dispute that it was not complying with the order, that it exposed its students to COVID-19, or that it refused to participate in contact tracing. *United Pet Supply*, 768 F.3d at 487.  In the face of an emergent danger to the public health, the government has a strong interest in rectifying that situation *immediately*. *Id.*; *see also North American Cold Storage Co. v. Chicago*, 211 U.S. 306 (1908).

On the facts of this case, then, *Matthews* instructs that Plaintiff received the process that was due.  The backdrop of this lawsuit is a public health crisis ravaging the entire globe, and while Plaintiff may very well prefer to chart its own course through this crisis, it has offered no colorable basis to conclude that it is constitutionally entitled to that preference.  Plaintiff has not pleaded a plausible claim for relief, and dismissal is appropriate.

## CONCLUSION AND RELIEF REQUESTED

With or without a pandemic, public health requirements can be controversial.  The wisdom and efficacy of policy decisions are—and should remain—up for serious debate.  It would be legal error, however, to conflate that debate with novel and unfounded theories about the unconstitutionality of the Public Health Code.  Constitutionalizing those issues extends the judicial function beyond its proper zone of competence and control.  Other authority gets to select the tools from that policy-making toolbox and decide how to use them.  More fundamentally, this Court should decide as a matter of both immovable jurisdiction and discretionary abstention that it should not intervene here.

Defendants Governor Whitmer, DHHS Director Robert Gordon, and Attorney General Dana Nessel respectfully request that the Court dismiss Plaintiff's state-law claims and abstain from exercising jurisdiction over Plaintiff's lawsuit or, in the alternative, dismiss Plaintiff's federal claims, and grant the Defendants such and further relief as the Court deems just and appropriate.

40

Respectfully submitted,


 /s/ Daniel J. Ping
Daniel J. Ping (P81482)
John G. Fedynsky (P65232)
Assistant Attorneys General
Michigan Dep't of Attorney General
Attorney for Defendants Governor
Whitmer and MDHHS Director Gordon
P.O. Box 30736
(517) 335–7632
pingd@michigan.gov
fedynskyj@michigan.gov


/s/ Ann M. Sherman
Ann M. Sherman (P67762)
Deputy Solicitor General
Rebecca A. Berels (P81977)
Assistant Attorney General
Michigan Dep't of Attorney General
P.O. Box 30212, Lansing, MI 48909
(517) 335-7628
ShermanA@michigan.gov
BerelsR1@michigan.gov

## PROOF OF SERVICE (E-FILE)

I hereby certify that on November 17, 2020, I electronically filed the foregoing

document(s) with the Clerk of the Court using the ECF System, which will provide

electronic notice and copies of such filing of the following to the parties:

- Defendant Governor Gretchen Whitmer, Director Robert Gordon, and Attorney General Dana Nessel's Joint Brief in Support of Motion to Dismiss Plaintiff's Complaint Under Fed. R. Civ. P. 12(b)(1) & (6)

A courtesy copy of the aforementioned document was placed in the mail

directed to:  Judge Paul L. Maloney, 137 Federal Bldg., 410 W. Michigan Ave.,

Kalamazoo, MI  49007.

<div style="margin-left:50%">

*/s/ Daniel J. Ping*
Daniel J. Ping (P81482)
John G. Fedynsky (P65232)
Assistant Attorneys General
Michigan Dep't of Attorney General
Attorney for Defendants Governor
Whitmer and MDHHS Director Gordon
P.O. Box 30736
(517) 335–7632
pingd@michigan.gov
fedynskyj@michigan.gov

</div>

42